**Terri L. NICHOLS, Plaintiff–Appellee,**

v.

**Anthony M. FRANK, Postmaster General; U.S. Postal Service, Defendants–Appellants.**

Nos. 91–36241, 92–35315.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1993.

Decided Nov. 29, 1994.

Order Dec. 13, 1994.

504

Judith D. Kobbervig, Asst. U.S. Atty., Portland, OR, for defendants-appellants.

Elizabeth McKanna, Barbara J. Diamond, Bennett & Hartman, Portland, OR, for plaintiff-appellee.

Before: REINHARDT, BRUNETTI, and FERNANDEZ, Circuit Judges.

Opinion by Judge REINHARDT; Concurrences by Judge FERNANDEZ and Judge BRUNETTI.

## OPINION

REINHARDT, Circuit Judge:

Terri Nichols ("Nichols"), a deaf-mute postal employee, was sexually harassed by her night-shift supervisor and, as a result, repeatedly but unwillingly performed oral sex on him over a period of approximately six months. The Postmaster General and the United States Postal Service (collectively referred to as "Postal Service") were found liable under Title VII of the Civil Rights Act of 1964, following a non-jury trial. They appeal the finding of liability, as well as the district court's award of back pay to Nichols. We affirm.

## I. FACTS

Terri Nichols is deaf and mute. She communicates through sign language and in writing. Like many deaf individuals, Nichols' reading ability is limited. She reads at only a fifth-grade level. In the fall of 1986, Nichols became a night-shift mail sorter at the Salem, Oregon, postal facility.

Ron Francisco was the night-shift supervisor and the highest ranking manager at the postal facility during that shift. He had the

authority to grant employees leave and overtime pay, and to ask employees to perform various clerical duties. He had access to keys that opened private offices throughout the facility. Most important, Francisco was the only supervisor who was able to communicate with Nichols in sign language.

Shortly after Nichols commenced work, Francisco asked her to copy some documents for him. He assigned another employee to assume her duties on the work floor and followed her into the copy room. While they were in the copy room together, Francisco started kissing Nichols and indicated that he wanted her to perform oral sex on him. She refused his advances, but ultimately complied because she was afraid she would lose her job if she refused. According to Nichols:

I remember that when this first happened I was just in shock. I was nervous. I was upset. I wasn't happy doing it, and I was hoping it would never happen again. And I just kept that all to myself. But then there was repeats and repeats and repeats, and I was more upset and I didn't want it. I didn't want to do it again and again for him, and I didn't know how to say, "Stop, just stop."

This routine occurred repeatedly over a period of approximately six months.

During that entire six-month period, Nichols never solicited any sexual contact with Francisco. However, she did not report Francisco's actions to anyone. She feared that she would not be believed and that Francisco would eventually retaliate against her. She did not tell her husband because she feared that it would harm their marriage. According to Nichols:

I tried to kill myself because I just didn't know how to tell my husband, you know, what was going on ... I was afraid that he would take my children and divorce me. And so I was just stuck. I was stuck between the two and there was no one I could talk to. I was afraid other people

wouldn't believe me, so I was really stuck with both. Say, if I went and I told anybody on him, on the supervisor I would lose my job. My husband and I had just recently bought a house and that house depended on my earnings, and I didn't want to lose everything. And that job was so important to the support of my family, so I was just stuck with the two.

As a result of the repeated forced sexual conduct with Francisco, Nichols became depressed, anxious, and irritable. She had frequent nightmares and difficulty sleeping and eating:

You know, I was losing weight. I wasn't able to eat regularly. I didn't have enough sleep. I got real emotional at home. I was angry. I remember as time progressed, I was getting crazier. I hated that sex. I didn't want sex even with my husband.

In April 1987, six months after Nichols commenced orally copulating Francisco, her husband filed for divorce. Nichols sought two weeks leave of absence from Francisco to deal with her family problems. When she did so, he requested that she perform oral sex on him once again. She complied for the last time, whereupon Francisco approved her request for a leave of absence.

Nichols ultimately reported Francisco's harassment. She filed a complaint with the Postal Service, the EEOC, and the American Postal Workers Union. She was diagnosed as having post-traumatic stress disorder and was granted federal disability benefits from April 14, 1987, until December 4, 1989. She is currently employed at another postal facility in Oregon and has sole custody of her two young children. Francisco is still employed at the Salem post office.[1]

## II. PROCEEDINGS BELOW

After a non-jury trial, the district court concluded that the Postal Service was liable for sexual harassment under Title VII of the

---

1. While Nichols' complaint against Francisco was being investigated, another female postal employee made similar allegations of sexual harassment against him. On October 31, 1987, Francisco was terminated by the Postal Service. The Field Director of Human Resources affirmed his termination. The Merit Systems Protection Board reversed, however, and Francisco was reinstated in April 1988. The facts set forth in our opinion are as found by the district court in this case.

Civil Rights Act of 1964.[2] The district court first found that Francisco's acts created a "hostile work environment" for Nichols. That is, his acts were "sufficiently severe or pervasive [as] to alter the conditions of [Nichols'] employment and create an abusive working environment." *See Nichols v. Frank,* 771 F.Supp. 1075, 1078 (D.Or.1991). The district court then found that the appellants were liable for Francisco's harassment of Nichols. *Id.* at 1078–81. It reasoned that, under the "principles of the laws of agency," the appellants were liable because Francisco had been acting within the "scope of his employment" when he harassed Nichols. *Id.* (applying *Dias v. Sky Chefs, Inc.,* 919 F.2d 1370, 1375 (9th Cir.1990), *vacated by* 501 U.S. 1201, 111 S.Ct. 2791, 115 L.Ed.2d 965, *on remand,* 948 F.2d 532 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1294, 117 L.Ed.2d 517 (1992)).[3]

Accordingly, the district court awarded Nichols back pay for the two and one-half year period during which she was unable to work. Nichols had previously received disability benefits for that period under the Federal Employees' Compensation Act ("FECA"); however, those benefits were, pursuant to statute, limited to only 75% of her total salary. *See infra* p. 515 n. 8. Relying on Title VII, the district court awarded Nichols back pay in an amount sufficient to make up the difference between the benefits awarded her and the salary she would have received during her period of disability.[4]

Upon appeal, the Postal Service does not contest the district court's finding of a hostile work environment, but only the finding that it was liable for Francisco's actions. It ar-

gues that the district court used the wrong test in making its liability determination. It further contests the district court's award of partial back pay to Nichols.

## III. DISCUSSION

### A. Employer Liability

■■■ *1. Hostile Environment Liability.* As an initial matter, we agree with the Postal Service that the district court used the wrong test in holding it liable for Francisco's conduct. The proper analysis for employer liability in hostile environment cases is what management-level employees knew or should have known, *not* whether an employee was acting within his "scope of employment." *See EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1515–16 (9th Cir.1989) ("[E]mployers are liable for failing to remedy or prevent a hostile or offensive work environment of which management-level employees *knew,* or in the exercise of reasonable care *should have known.*" (emphasis added)). Thus, the district court erred by applying the scope of employment test. Moreover, with respect to the hostile environment claim, the error was prejudicial. Had the proper analysis been applied, given the record before us the Postal Service could not have been held liable on a hostile environment theory.

■■■ *2. Quid Pro Quo Liability.* Despite the district court's erroneous reliance on "hostile environment," we hold that the Postal Service is liable for Francisco's acts. Because the acts constituted quid pro quo harassment *in addition to* hostile environment harassment, the Service is liable for his

---

**2.** Under Title VII, it is an unlawful employment practice for an employer

> to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e–2(a)(1).

**3.** The Supreme Court has held that employers can be held liable for the acts of sexual harassment by their employees that create a "hostile environment." *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). The Court held that "Con-

gress wanted courts to look to agency principles for guidance in this area" and expressly looked to the Restatement (Second) of Agency for such "common-law principles." *See id.* The Court declined to issue a "definitive rule" on employer liability, however, and left that task to the lower courts. *See id.*

**4.** The judgment consisted of back pay of $43,-661.40; pre-judgment interest of $10,854.35; annual leave of 433.28 hours; sick leave of 288.00 hours; retirement benefits of $1,039.11; and post-judgment interest for any amounts not paid within 60 days of the judgment.

acts under the doctrine of respondeat superior. *See infra* pp. 513–14.

■ *(a) Overview.* The essence of the quid pro quo theory of sexual harassment is that an individual "relies upon his apparent or actual authority [in order] to extort sexual consideration from an employee." *Henson v. City of Dundee,* 682 F.2d 897, 910 (11th Cir.1982). We have stated that quid pro quo sexual harassment occurs whenever "employers condition employment benefits on sexual favors." *See, e.g., Ellison v. Brady,* 924 F.2d 872, 875 (9th Cir.1991).

Here, Nichols presented evidence to the district court that Francisco conditioned employment benefits on sexual favors. The district court credited her testimony. Its findings demonstrate the close connection between Nichols' request to take a two-week leave of absence and her performance of oral sex on Francisco. According to the district court:

> Nichols requested two weeks leave of absence so that she could deal with her family problems. On April 14, 1987, at his request, Nichols engaged in oral sex with Francisco for the last time. *Following the act, Francisco approved Nichols' request for leave.*

*Nichols v. Frank,* 771 F.Supp. 1075, 1077–78 (D.Or.1991) (emphasis added). The court's finding was consistent with Nichols' testimony that she was "required" to perform oral sex in order to obtain leave:

> Q Terri, you have just stated that the sexual harassment started on October 27, 1986. How long did it last? Do you remember when the last time came, *the last time you were required?*
>
> A *That's when I asked for the leave for two weeks, and that was the last time.*

(emphasis added). Nichols also testified that Francisco approved her other leave requests only because she agreed to perform oral sex on him:

> Q Do you believe that Mr. Francisco approved these leaves because you were performing your oral sex on him?
>
> A Yes.

Q Do you believe if you were not performing the oral sex he wouldn't have approved some of these leaves?

A *If I refused, yes, I am pretty sure that he would have turned me down.*

(emphasis added).

Nichols also presented evidence that Francisco conditioned other kinds of employment benefits on her sexual favors. For example, Nichols testified that her work evaluations were sometimes conditioned on her willingness to perform oral sex on Francisco. She testified that he asked her to perform oral sex after they had just discussed her sick leave and her attendance record:

> Q Did you ever have any discussions regarding work or other things while you were in [a room alone with Francisco]?
>
> A A few times—I remember once talking about my sick leave and my attendance. There was a book and we discussed something in the book.
>
> Q Okay. *And then[,] after that[,] was that a time you were asked to perform sex?*
>
> A *Yes.*

(emphasis and punctuation added).

Finally, Nichols presented evidence that Francisco conditioned her continued employment with the Postal Service on her willingness to perform oral sex:

> Q Did you agree to oral sex with him?
>
> A I didn't want to have sex. I was very frightened, you know, if I said no.
>
> Q Why were you frightened?
>
> A I was afraid that he'd get me in trouble. I knew it was wrong, but I was really afraid because *I knew he could fire me because he was a superintendent.* I was shocked, you know. And I just—I couldn't say no.

(emphasis added).

In view of Nichols' testimony and the district judge's credibility determination, we cannot say that the court's factual findings are clearly erroneous. Thus, we accept them as correct for purposes of this appeal.

*(b) Definition.* The question of what constitutes sexual harassment is a complicated and increasingly important one in our soci-

ety. There is no agreed upon definition of the newly popular term. In some versions, it appears to cover the widest possible range of sins, from physical assault to reading a magazine in a public facility. Whether particular conduct is appropriate or whether it crosses the line is the subject of disagreement and controversy, always heated and often legitimate. Public opinion can change rapidly. It is quite possible for conduct that is acceptable today to become unacceptable tomorrow. One's views are influenced by one's age, sex, national origin, religion, philosophy, education, and experience. There is no uniform attitude towards the role of sex nor any agreement on what is appropriate for inclusion in a code governing sexual conduct. Nevertheless, the right to be free from unwanted sexual attention is of fundamental importance, and answers to the relevant questions must be found. Nothing is more destructive of human dignity than being forced to perform sexual acts against one's will. Rape is still the ultimate violation. At the same time, unfounded charges, or charges based on misconceptions or misunderstandings, can wrongfully destroy careers, if not lives.

Workplace sexual harassment is a particularly complex and sensitive form of the genus. There are two competing concerns. On the one hand, courts are understandably reluctant to chill the incidence of legitimate romance. People who work closely together and share common interests often find that sexual attraction ensues. It is not surprising that those feelings arise even when one of the persons is a superior and the other a subordinate. As our workforce grows, and more and more of us find it necessary, or desirable, to earn our own living, we spend an increasing amount of our time at work. Sexual barriers to employment have lessened. We tend these days, far more than in earlier times, to find our friends, lovers, and even mates in the workplace. We spend longer hours at the office or traveling for job-related purposes, and often discover that our interests and values are closer to those of our colleagues or fellow employees than to those of people we meet in connection with other activities. In short, increased proximity breeds increased volitional sexual activity.

On the other hand, the opportunity to take unfair advantage of a co-worker or subordinate has increased commensurately. Title VII embodies a most essential principle. It entitles individuals to a workplace that is free from the evil of sexual intimidation or repression. It is frequently difficult to reconcile the two competing values. In some cases, the difficulty arises shortly after an individual decides that he or she would like to explore the possibility of a romantic relationship with a co-worker. When does a healthy constructive interest in romance become sexual harassment? To what extent is pursuit of a co-worker proper but of a subordinate forbidden? Is wooing or courting a thing of the past? Must a suitor cease his attentions at the first sign of disinterest or resistance? Must there be an express agreement before the person seeking romance may even hold the hand of the subject of his affection? Is it now verboten to steal a kiss? In the workplace? Everywhere? Under all circumstances or only some? Has the art of romantic persuasion lost its charm? Questions relating to love and sex are among the most difficult for society to answer—in or out of the workplace—and courts are hardly experts in that realm. Still, we must find ways to define sexual harassment, to protect potential victims against such conduct, and to enforce the rights of those who suffer injury; and we must do so with clarity, with understanding, and with wisdom.

The most oppressive and invidious type of workplace sexual harassment is quid pro quo sex. There can be no justification for requiring a worker to engage in sexual acts in order to obtain a job or job-related benefit, or to avoid a job-related detriment. Most workers subjected to sexual pressure in the workplace have little means of defense—other than the law. For economic reasons, most workers cannot simply abandon their employment—new jobs are hard to find.

Under Title VII, employers are held strictly accountable if they place in positions of authority persons who extract sexual favors from those over whom they exercise power. Yet, even the question of what constitutes the most blatant form of sexual harass-

ment—quid pro quo harassment—is not always answered easily. For one thing, it is frequently not clear what the facts actually are. The parties may tell totally conflicting stories, in the trial court and elsewhere, and there are often no percipient witnesses. When there is a dispute over what transpired, we rely on the findings of the factfinder, unless those findings are clearly wrong. Here, the facts are not the problem. The district court's findings are not clearly erroneous. The question instead is whether the facts make out a case of quid pro quo sexual harassment for purposes of Title VII.

While we have not previously decided how we determine what constitutes quid pro quo sexual harassment, several other circuits have announced a five-part test for doing so. *See, e.g., Henson v. City of Dundee,* 682 F.2d at 909.[5] We find that test, like a number of others employed by the courts, to be unnecessarily complicated and overly formalistic. For example, the first part of the test asks whether an employee is a "member of a protected group." This inquiry is unnecessary because *all* individuals—male or female—belong to a "protected" group for purposes of determining discrimination on the basis of their sex. We find other parts of the five-part test to be equally unnecessary or opaque. Some appear to overlap considerably. Parts two and three fall into that category. Moreover, sexual harassment is *ordinarily* based on sex. What else could it be based on? In any event, we decline to adopt the five-part test in this circuit.

Instead, we turn to the EEOC guidelines, which the Supreme Court has held to be "a body of experience and informed judgments to which courts ... may properly resort for guidance." *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404. The guidelines define quid pro quo sexual harassment as:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... when (1) submission to such conduct is made either *explicitly or implicitly* a term or condition of an individual's employment, [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual. ...

*See* 29 C.F.R. §§ 1604.11(a)(1) to (2) (1993) (EEOC guidelines) (emphasis added).

■ Distilling the EEOC guidelines to their essence, we hold that quid pro quo sexual harassment occurs whenever an individual explicitly or implicitly conditions a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct. *Accord Chamberlin,* 915 F.2d at 783 (quid pro quo includes the situation where "a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate" (internal quotes omitted)); *Spencer,* 894 F.2d at 658 (quid pro quo is where "sexual consideration is demanded in exchange for job benefits"); *Collins v. Baptist Memorial Geriatric Center,* 937 F.2d 190, 196 (5th Cir.1991) (quid pro quo is where "job benefits [are] conditioned on the acceptance of the harassment"), *cert. denied,* —— U.S. ——, 112 S.Ct. 968, 117 L.Ed.2d 133 (1992); *Highlander,* 805 F.2d at 648 (6th Cir.1986) (quid pro quo includes the situation where "submission to the unwelcomed sexual advances of supervisory personnel [is] an express or implied condition for receiving job benefits"); *Hicks,* 833 F.2d at 1413 (quid pro quo is where "submission to sexual conduct is made a condition of concrete employment benefits").

■ In quid pro quo cases, we may reach our conclusion by either of two means. We can apply an objective standard, under

---

**5.** The test involves (i) whether the employee belonged to a protected group; (ii) whether the employee was subjected to unwelcome sexual harassment; (iii) whether the harassment complained of was based on sex; (iv) whether the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; and (v) whether there was respondeat superior. *Id.* at 909; *accord Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777 (1st Cir.1990); *Spencer v. General Electric Co.,* 894 F.2d 651 (4th Cir.1990); *Jones v. Flagship Int'l,* 793 F.2d 714 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Highlander v. K.F.C. Nat'l Management Co.,* 805 F.2d 644 (6th Cir.1986); *Moylan v. Maries County,* 792 F.2d 746 (8th Cir.1986); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406 (10th Cir.1987).

which we determine whether a reasonable person in the accuser's position would have believed that he or she was the subject of quid pro quo sexual harassment. If the accuser is a woman, we use a hypothetical woman in applying our reasonable person standard. *Ellison v. Brady*, 924 F.2d 872, 878–80 (9th Cir.1991). If the accuser is a man, we use a hypothetical man. *Id.* at 879 n. 11. Of course, a reasonable person is not defined solely by his or her sex. Other immutable traits possessed by the person bringing the charge, including but not limited to race, age, physical or mental disability, and sexual orientation, may in particular cases be relevant to the inquiry as well.

■ In the alternative, we can apply a subjective standard, under which the fact-finder may inquire into whether the alleged harasser actually intended to subject the accuser to quid pro quo sexual harassment. Under this approach also, it is proper for the fact-finder to consider the fundamental or immutable characteristics of the individual bringing the charge. But here, in addition, the fact-finder may consider other individual traits or characteristics known to the accused that may make the victim especially or uniquely susceptible to quid pro quo sexual harassment. A defendant may be liable under the subjective test if he intentionally takes advantage of some particular fear or weakness that afflicts the accuser. By the same token, characteristics of and information about the accused which are known to the accuser may become part of the mix. A showing that either the subjective or objective standard is met is sufficient to support the imposition of liability.

We note that difficult factual and legal questions will almost always arise whenever either the conditioning of benefits (or absence of detriment) or the request for favors is not explicit, but is instead *implicit* in the harasser's communications or dealings with his prey. For example, quid pro quo harassment is clear if a manager explicitly tells his subordinate "I will fire you unless you sleep with me." However, it is much less clear whether a violation has occurred if a manager simply asks the subordinate whether she would like to have a drink after work to talk about a possible promotion and then sometime after she refuses, awards the position to another employee. It is even less clear if the manager merely invites the employee out for a drink on one or more occasions but does not suggest that he wishes to discuss work-related matters; if the manager is spurned and subsequently withholds anticipated benefits, it may set off alarm bells, but further evidence would be required before a charge of sexual harassment could be sustained.

■ Harassment in cases of implicit conditioning can be inferred only from the particular facts and circumstances of the case. We must examine each such charge with the utmost care, for an error either way can result in a gross injustice and will often have a disastrous impact on the life of whichever person is truly the injured party.

The ability to identify implicit quid pro quo harassment accurately is important for two very different reasons. We have already mentioned the first: the possibility that the charge is erroneous or the result of a misunderstanding, and the disastrous consequences that may befall an innocent person. The second involves precisely the opposite concern. Implicit quid pro quo harassment is a most serious matter. It is far more likely to take place than is the explicit variety. As time goes by and harassers learn that they can no longer victimize their prey at will, their actions become less overt. In Hollywood, for example, the casting couch has been replaced by more subtle techniques. Yet for the potential employee, the result is still the same. The parallel with racial discrimination is obvious. Landlords offering apartments for rent no longer post notices saying "Whites Only." Instead, they will tell African–Americans and other minorities that the apartment has already been rented. Employers who do not wish to hire minorities no longer announce that such is their policy. They now cover up their misdeeds and offer false explanations for their employment misconduct. So, too, with the sexual harasser.

■ In attempting to determine whether implicit quid pro quo harassment has occurred, the key is often the verbal

nexus. That is one way of establishing a violation. The tighter the nexus between a discussion about job benefits and a request for sexual favors, the more likely that there has been an "implicit" conditioning by the harasser. However, each case differs, and no rule or set of rules will provide an answer in all circumstances. Five-part, seven-part or even ten-part tests frequently serve only to obfuscate the real inquiry. In truth, there is no substitute for a rigorous examination in each instance of all of the relevant facts and circumstances, as well as the application of common sense, sound general principles, and a true understanding of human nature.

*(c) Analysis.* Here, we have no difficulty concluding, under both the objective and subjective approaches, that Nichols was subjected to quid pro quo sexual harassment. We do not have to wrestle with the more subtle questions that are present in many cases involving "implicit" conditioning. The nexus between Francisco's discussion of work-related matters and his requests for oral sex was *so close* that there can be no doubt that a reasonable person in Nichols' position would have understood that Francisco was conditioning the granting of job benefits on the performance of the sexual act. That nexus also serves to establish that Francisco in fact intended to do so.

First, as we noted earlier, Nichols asked for a two-week leave of absence. Before granting her request, Francisco requested that she perform oral sex on him. She did so unwillingly. *Immediately following the act,* he granted her leave. *See supra* p. 509. (Nichols also testified that other requests for leave also depended upon her willingness to perform oral sex on Francisco.) All of this occurred at the job site. The nexus between the job benefit—here, Nichols' ability to obtain leave—and the sexual act could not have been closer.

Second, as we noted above, Nichols testified that Francisco would sit in a room in the workplace and discuss her sick leave and her attendance record. *Immediately thereafter,* he would ask her to perform oral sex on him. She would do so on the spot. Again, we conclude that the nexus between the job benefit—here, Nichols' ability to receive a positive work evaluation—and the sexual act could hardly have been closer.

Third, as we noted above, Nichols testified that she submitted to Francisco's requests because she feared that he would fire her if she refused. All of his requests—and the subsequent involuntary acts—occurred during her work shift and on postal service property. In light of these facts, and in light of our conclusion that the granting of benefits was conditioned upon Nichols' committing sexual acts upon Francisco, we have no difficulty in further determining that her continued employment was similarly conditioned.

■ In sum, we conclude that a supervisor's intertwining of a request for the performance of sexual favors with a discussion of actual or potential job benefits or detriments in a single conversation constitutes quid pro quo sexual harassment. It follows that in the case before us Francisco, by his conduct, implicitly conditioned the granting of specific job benefits upon Nichols' performance of sexual favors. Moreover, the totality of the conduct involved leads to the conclusion that Nichols' continued employment with the Postal Service was at stake. Either one of these circumstances would be sufficient to support a holding of quid pro quo sexual harassment under the subjective standard.[6] In addition, these facts clearly establish that a reasonable person in Nichols' position would have believed that she was the subject of quid pro quo sexual harassment. Thus, both forms of analysis, subjective and objective, compel our result here.

■ *(d) Liability.* Once quid pro quo sexual harassment has been established, the harasser's employer is, ipso facto, liable. As

---

6. On appeal, the Postal Service attempts to rebut Nichols' testimony by arguing that no sexual conduct ever occurred between Nichols and Francisco. At trial, Francisco denied any sexual involvement with Nichols. The district court soundly rejected Francisco's testimony in its findings of fact. *See Nichols v. Frank,* 771 F.Supp. 1075, 1077–78 (D.Or.1991) (finding that Francisco had repeatedly engaged in sexual conduct with Nichols). In fact, it refused to make *any* findings based on his version of the facts. Because we cannot say that the district court's findings are clearly erroneous, we reject the Postal Service's argument.

we discussed earlier, quid pro quo sexual harassment occurs whenever an individual conditions a job, a job benefit or the absence of a job detriment upon an employee's submission to sexual conduct. A harasser is able to grant such job benefits or detriments only because he has actual or apparent authority to do so "delegated to him by his employer." *See* EEOC Policy Guidance on Current Issues of Sexual Harassment, 8 Fair Empl.Prac.Man. (BNA) 405:6681, at 6694 (Mar. 19, 1990) [hereinafter EEOC Policy Guidance].

■ Under traditional agency principles, the exercise of such actual or apparent authority gives rise to liability on the part of the employer under a theory of respondeat superior. *See* Restatement (Second) of Agency § 219(2)(d) (1958). We have so held, *see Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979), and the EEOC has so held. *See* EEOC Policy Guidance, *supra,* at 6694 ("An employer will *always* be held responsible for acts of 'quid pro quo' harassment." (emphasis added)). Other circuits agree. *See Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981) (D.C.Circuit); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 901 (1st Cir.1988) (First Circuit); *Carrero v. New York City Housing Authority,* 890 F.2d 569, 579 (2d Cir.1989) (Second Circuit); *Craig v. Y & Y Snacks,* 721 F.2d 77, 80 (3d Cir.1983) (Third Circuit); *Katz v. Dole,* 709 F.2d 251, 255 n. 6 (4th Cir.1983) (Fourth Circuit); *Highlander,* 805 F.2d at 648–49 (Sixth Circuit); *Horn v. Duke Homes,* 755 F.2d 599, 605 (7th Cir.1985) (Seventh Circuit); *Crimm v. Missouri Pacific R.R.,* 750 F.2d 703 (8th Cir.1984) (Eighth Circuit); *Henson,* 682 F.2d at 909–10 (Eleventh Circuit). Here, Nichols has successfully established that her supervisor, Francisco, engaged in quid pro quo sexual harassment. Accordingly, the Postal Service is liable for his acts.

### B. Exclusivity of Disability Payments

The Postal Service next argues that even if it is liable for Francisco's harassment, Nich-

ols is not entitled to receive anything beyond what she has already received in federal disability benefits. It contends that under the Federal Employees Compensation Act, 5 U.S.C. §§ 8101, *et seq.* her receipt of those disability benefits renders them the "exclusive" form of compensation for Nichols' work-related injuries. *See* 5 U.S.C. § 8116. Accordingly, the Postal Service claims that the district court erred in awarding Nichols the difference between her disability benefits and 100% of her back pay. Based upon a plain-language reading of the relevant statutes (FECA and Title VII), we reject the appellants' arguments and affirm the district court's judgment.

*1. Statutory Provisions.* FECA compensates federal employees for certain lost wages and medical costs that are incurred as a result of "injury" sustained in the performance of their duties. *See* 5 U.S.C. § 8102. The act defines "injury" as follows:

> in addition to [1] injury by accident, [2] a disease proximately caused by employment, and [3] damage to or destruction of medical braces, artificial limbs, and other prosthetic devices. . . .

*See* 5 U.S.C. § 8101(5). FECA limits a federal employee's total compensation for his work-related "injuries" to 75% of his monthly pay.[7] FECA also limits an employee's right to receive other forms of disability compensation from the United States. Among other things, FECA expressly provides that the liability of the United States "with respect to the injury or death of an employee is *exclusive.*" *See id.* § 8116(c) (emphasis added).

By contrast, Title VII compensates employees who have suffered from unlawful discrimination on, among other things, the basis of their sex. *See* 42 U.S.C. § 2000e-2. Under Title VII, employees who have suffered from such unlawful discrimination are entitled to equitable relief, including, in appropriate cases, 100% of their back pay:

---

7. *See id.* § 8105 (establishing that, if the disability is total, the United States "shall pay the employee ... monthly monetary compensation equal to 66 2/3 percent of his monthly pay"); *id.* § 8110 (establishing that, in the case of an employee with one or more dependents, he is "entitled to have his basic compensation for disability augmented" by "8 1/3 percent of his monthly pay").

[S]uch affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, *with or without back pay* (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any *other equitable relief* as the court deems appropriate.

*See id.* § 2000e–5(g)(1) (emphasis added).

■ *2. Analysis.* The Postal Service argues that Nichols is barred from receiving additional back pay by the exclusivity provisions of FECA. *See* 5 U.S.C. § 8116. We reject this argument. Although FECA's exclusivity provisions prevent a court from awarding Nichols additional payments for her work-related "injury" within the meaning of the act (i.e., her post-traumatic stress disorder), the provisions do not prevent an award of additional payments for harms that fall *outside* of FECA's definition of "injury." Because the district court's award compensated Nichols solely for the harm she suffered from sex discrimination—which is not an "injury" within the meaning of FECA— the exclusivity provisions are not applicable to this case.

FECA's exclusivity provisions apply only to additional payments for work-related injuries. For example, Nichols' post-traumatic stress disorder is clearly an injury as defined by the act because it is "a disease proximately caused by employment." *See supra* pp. 3– 4; American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* § 309.89, at 247–51 (3d ed. rev. 1987) [hereinafter DSM–III–R]. Accordingly, under FECA's exclusivity provisions, Nichols is barred from recovering any other sums from the United States relating to her post-traumatic stress disorder. *See* 5 U.S.C. §§ 8116(b) & 8116(c).

By contrast, the harm that Nichols suffered from sex discrimination is *not* an "injury" within the meaning of FECA. First, such harm is not an "injury by accident." The harm arose from Francisco's sex discrimination, which was an intentional—not an accidental—act. Second, the harm is not "a disease proximately caused by the employment." By contrast with post-traumatic stress disorder (which is a disease classified by DSM–III–R), the impact that sex discrimination has on a victim is not a "disease." Third, the harm is not "damage to or destruction of medical braces, artificial limbs, and other prosthetic devices." Accordingly, the harm does not qualify as an "injury" on that ground either. Therefore, the exclusivity provisions of FECA do not apply to the district court's award.

Our conclusion is not only compelled by the plain language of FECA and Title VII, but also by common sense. Under the Postal Service's argument, a victim of sex discrimination who does *not* suffer from post-traumatic stress disorder would be entitled to receive 100% of her back pay under Title VII. However, a victim of sex discrimination who also happens to suffer from a disease such as stress would be entitled to only 75% of her pay under FECA.[8] Congress could not have intended such an unjust result. Under Title VII, victims of sex discrimination—regardless of whether that discrimination results in a work-related "injury" or not—are entitled to a maximum of 100% of their back pay, as long as that sum does not lead to double recovery. Duplicative benefits must be deducted, as the district court did here.[9]

■ We reach the same conclusion on a second, independent ground. As we have noted above, relief under Title VII in the form of back pay is purely "equitable" in nature. *See supra* pp. 514–15.[10] By contrast, relief under FECA consists of "compensation" (i.e., damages) defined as a per-

---

8. This is because federal disability benefits are limited to 75% of an employee's back pay and, under the Postal Service's argument, full recovery would be barred by FECA's exclusivity clause.

9. Title VII provides:
   Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.
   *See id.*

10. We construe Title VII as it stood prior to the 1991 amendments, Pub.L. 102–166, 105 Stat. 1071 (1991). We express no view on the effect of the amendments on the essential nature of Title VII relief. In any event, any change in that

centage of the employee's monthly salary. Because the exclusivity provisions of FECA are limited solely to other forms of "compensation," they are simply not applicable to the types of "equitable" relief authorized by Title VII. *See, e.g., Smith v. Barton,* 914 F.2d 1330, 1337 (9th Cir.1990) (holding that compensatory money damages are generally "distinct" from equitable forms of relief, such as injunctions or back pay), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991).

In sum, Nichols may recover payments for discriminatory harm to the full extent allowed by Title VII. The only limit that Title VII places on back pay awards is a prohibition against double recovery. *See* 42 U.S.C. § 2000e–5(g)(1). The district court's award did not allow for any such windfall. It simply awarded the *difference* between Nichols' disability benefits and 100% of the salary she would have received during her disability period. That award was not only proper, it fully implemented the intent of Congress with respect to *both* statutes. Accordingly, we affirm the judgment of the district court on this issue as well.

## IV. CONCLUSION

We affirm the judgment of the district court. Nichols suffered from quid pro quo sexual harassment by her supervisor, an employee of Postal Service. The Service is therefore liable for such harassment. We further hold that Nichols' receipt of FECA benefits do not prevent her from receiving an additional monetary award under the remedial provisions of Title VII. Accordingly, Nichols was properly awarded an amount equal to the difference between her disability benefits and 100% of her back pay. The judgment of the district court is

AFFIRMED.

FERNANDEZ, J., concurring:

I concur in Parts I, II, III.A.1 and III.B of Judge Reinhardt's opinion. However, as to Part III.A.2, I concur in the result only.

status would probably not be retroactive. *See Landgraf v. USI Film Products,* —— U.S. ——, 114

The facts of this case, as found by the district court and outlined by Judge Reinhardt, are rather simple. They spell out an elemental demand for sexual favors. Francisco, the supervisor, had actual authority over the conditions of Nichols' employment. He made submission to his sexual demands an explicit or implicit condition of her employment, and she gave her unwilling consent. *See* 29 C.F.R. § 1604.11(a) (1993); *Ellison v. Brady,* 924 F.2d 872, 875 (9th Cir. 1991). His significant power and her significant weakness contributed to that. In other words, on virtually any theory one can construct, there was quid pro quo sexual harassment liability.

I, therefore, concur in the result, but that is all I concur in. I do not concur in Judge Reinhardt's lengthy, detailed, even scholarly attempt to describe the length and breadth of the elements needed to prove a case of quid pro quo sexual harassment—a discussion meant to cover everything from the core to the penumbra. This case is so clearly at the core that we need not decide the outer limits.

In fine, whether Judge Reinhardt's efforts have made the legal waters pellucid or lutaceous, I do not say. I only say that they are largely unnecessary to the resolution of *this* case. Thus, I do not join in the reasoning of Part III.A.2, nor do I join in its explication of the law. I do, however, concur in the result.

BRUNETTI, Circuit Judge, concurring:

I concur in Parts I, II, III.A.1, and III.B of Judge Reinhardt's opinion. As to Part III. A.2, I concur only in the result. I further concur in Judge Fernandez's concurrence.

### ORDER

Dec. 13, 1994

The Clerk is directed to add Court of Appeal No. 92–35315 to the existing opinion filed November 29, 1994.