UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PATRICIA LEE SZEDLOCK,
　　　　　*Plaintiff-Appellant,*

v.

GEORGE J. TENET, Director of
Central Intelligence Agency,
　　　　　*Defendant-Appellee,*

and

CENTRAL INTELLIGENCE AGENCY,
　　　　　*Defendant.*

No. 01-1867

PATRICIA LEE SZEDLOCK,
　　　　　*Plaintiff-Appellee,*

v.

GEORGE J. TENET, Director of
Central Intelligence Agency,
　　　　　*Defendant-Appellant,*

and

CENTRAL INTELLIGENCE AGENCY,
　　　　　*Defendant.*

No. 01-1902

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T.S. Ellis, III, District Judge.
(CA-00-991-A)

Argued: February 27, 2003

Decided: April 3, 2003

Before MICHAEL, KING, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Bruce J. Terris, TERRIS, PRAVLIK & MILLIAN, L.L.P., Washington, D.C., for Appellant. Stephanie Robin Marcus, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Demian A. Schane, TERRIS, PRAVLIK & MILLIAN, L.L.P., Washington, D.C., for Appellant. Robert D. McCallum, Jr., Assistant Attorney General, Paul J. McNulty, United States Attorney, Dennis E. Szybala, Assistant United States Attorney, Marleigh D. Dover, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Denise D. Duprau, Office of General Counsel, CENTRAL INTELLIGENCE AGENCY, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

The plaintiff, Patricia Lee Szedlock, who is hearing impaired, obtained a jury verdict on her claim that the Central Intelligence Agency (CIA) failed to accommodate her disability. Szedlock nevertheless appeals three determinations by the district court: (1) that the Federal Employees Compensation Act (FECA), 5 U.S.C. § 8101 et seq., is the exclusive compensatory remedy for her work-related injury; (2) that certain of her claims are time-barred; and (3) that her

retirement benefits should be deducted from her backpay award. The CIA cross-appeals the district court's denial of its motion for a judgment as a matter of law. Finding no error, we affirm.

I.

Szedlock began working at the CIA in 1989. She held seven different positions between 1989 and her disability retirement in 1998. We will refer to them as Positions 1-7. Szedlock used both hearing aids and lip reading to compensate for her hearing impairment. She is not fluent in sign language.

Szedlock began her career at the CIA as an engineer on a computer-upgrade project (Position 1). The job required her to attend all-day, multi-party meetings. Because she primarily depended on lip reading, she often had difficulty following the flow of the conversation in large groups. She found these meetings stressful and exhausting. She also suffered dizziness, ear pain, and tinnitus. Because of these problems, she spoke with her supervisors, employees in the CIA's Equal Employment Opportunity (EEO) office, a counselor in the Employee Assistance Program (EAP), and CIA medical personnel. She asked for an oral interpreter (one who mouths the words spoken by others) or a notetaker. She requested these accommodations at least thirty-five times. In April 1990 the CIA sent Szedlock to be fitted with an Assistive Listening Device (ALD) and stronger hearing aids. The ALD amplified sounds at the meeting, but Szedlock found it distracting because it picked up noises in the room besides the voices of the speakers. The ALD also caused her pain, and she was concerned that it was causing additional hearing loss. She stopped using the ALD in October 1990. During part of a week-long meeting in June 1990, Nancy K., a secretary, acted as an oral interpreter. While in Position 1, Szedlock also asked for an exemption from flying and for advance sick leave; both requests were granted.

Szedlock moved to Position 2, acting as a systems engineer, in March 1991. Although all concerned believed that this job would be less problematic for her, Szedlock continued to have problems with multi-party meetings. Szedlock again spoke with her supervisors, employees in the EEO office, a counselor in the Employee Assistance Program, and CIA medical personnel. She asked for an oral inter-

preter or notetaker over 100 times while she was in Position 2. The EEO officer responsible for deaf employees informed her that the CIA did not have oral interpreters. In a discussion with an EAP counselor in July 1999, she mentioned several grounds for filing an EEO complaint against the CIA, including its failure to solve the problems she faced in meetings, but she did not lodge a complaint at that time. While in Position 2, Szedlock received amplifiers, TTY phones, and closed caption decoders from the CIA.

Because she was still having problems in meetings, however, Szedlock sought and received another transfer in December 1992; she became a technical investment analyst (Position 3). After Szedlock assumed Position 3, the CIA paid for her to take sign language classes, although she did not become fluent. Between December 1992 and November 1993 she unsuccessfully requested an oral interpreter or notetaker roughly twenty times. In November 1993 Szedlock proposed that a two-person team assist her. Under the proposal, Nancy K. would provide oral interpretation, while Steve B. would take notes for her. She relied on the interpretation team from January to June 1994, but ultimately decided it was not an effective solution.

In July 1994 Szedlock moved to another job, Position 4, also with the title of technical investment analyst. This job involved fewer multi-party meetings, but she continued to have problems in the meetings she did attend. She requested assistance on over 100 occasions while in this position. She never received an oral interpreter or notetaker, although the CIA did provide a sign interpreter on three occasions.

Between September 1994 and September 1996 the CIA paid for her to attend Johns Hopkins University to receive a masters degree; she also continued to receive her salary while she was in school (Position 5). In each class Johns Hopkins provided her with an oral interpreter, a notetaker, or a court reporter and notetaker.

When she returned to the CIA on September 30, 1996, she accepted a position as a branch chief (Position 6). While in this position she made over 130 requests for oral interpreters or notetakers. She received an accommodation on roughly ten occasions. Most of her formal requests were denied because the CIA's sign language

interpreters were booked to work at other events. The CIA did, however, seek to hire someone as a notetaker who would use the Computer Assisted Notetaking System (CANS). The CIA attempted to hire someone internally for a part-time job; Szedlock agreed that thirty-two hours a week would satisfy her needs. This effort was unsuccessful, although Szedlock acknowledged that the CIA's effort to fill this position was sincere. Moreover, her supervisors made efforts to ensure that those attending meetings with Szedlock spoke one at a time and within her line of sight. The CIA also looked for contract oral interpreters, but was unable to find one with an appropriate security clearance. An EEO employee attempted to recruit oral interpreters through ads in the Washington Post, Galludet University newspapers, and the magazine for the Registry of Interpreters for the Deaf and through inquiries at trade shows and technology fairs. The agency's EEO office sent out mass mailings to interpreters listed in the Registry of Interpreters for the Deaf and sought word of mouth recommendations. None of these efforts were successful.

In October 1997 the CIA performed an accommodation evaluation on Szedlock. The results of this test demonstrated that Szedlock's hearing had deteriorated considerably while she worked at the CIA. She believes this loss was caused by her need to turn her hearing aids to their highest level to improve her ability to function in meetings.

Szedlock's disability made it difficult for her to perform her job as a branch chief, so by mid-October 1997 she was no longer assigned any responsibilities. She was kept on the payroll, however, while the CIA sought a suitable position for her (Position 7). The CIA permitted her to use her time to apply for disability benefits and work on her EEO case. She filed for medical disability retirement, which was granted in May 1998. She formally retired on August 10, 1998.

Szedlock filed an EEO complaint in mid-1997. The CIA's EEO office dismissed the complaint, and the Equal Employment Opportunity Commission affirmed the dismissal. In June 2000 Szedlock brought this action in the Eastern District of Virginia, claiming that the CIA violated the Rehabilitation Act, 29 U.S.C. § 701 et seq., by its failure to accommodate her disability. The CIA filed a motion to dismiss in part and a motion for summary judgment. It argued that the statute of limitations barred claims for any violations before April 12,

1997, that Szedlock could not perform her job even with an accommodation, that the CIA reasonably accommodated Szedlock's disability, that the CIA made a good faith effort to accommodate her disability, and that FECA barred Szedlock's claims for compensation for her hearing loss. Szedlock also filed a motion for partial summary judgment.

In March 2001 the district court granted partial summary judgment to the CIA. The court determined that claims for any violations prior to September 30, 1996, were time barred. The court also held that FECA barred Szedlock's claims for damages resulting from the hearing loss. The case then went to trial. At the close of Szedlock's evidence, and again at the close of all the evidence, the CIA moved for judgment as a matter of law on its defense that it made a good faith effort to accommodate Szedlock. Although the district court considered the good faith issue to be a close question, it denied these motions. The jury found for the plaintiff and awarded her $25,000 in compensatory damages. The district court also awarded Szedlock equitable relief in the form of backpay, although it limited the award to two years because of her failure to mitigate damages. The court also offset the backpay award with the retirement benefits she received for the relevant period. Szedlock appeals the offset ruling and the award of partial summary judgment to the CIA. The CIA cross appeals the district court's denial of its motion for judgment as a matter of law on its good faith defense.

## II.

Szedlock first argues that because the hearing loss she suffered while working was caused by the CIA's failure to accommodate, she can receive compensatory damages for this injury under both FECA, 5 U.S.C. § 8101 et seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq. We disagree. FECA provides compensation and medical benefits to federal employees who suffer work-related injuries. Under FECA employees receive something less than full compensation for their injuries, but may recover without demonstrating that the employer was at fault. *See* 5 U.S.C. §§ 8105, 8110. At the same time, the statute limits the employee's ability to recover from the federal government under other statutes. The statute states that the government's liability under FECA:

with respect to the injury . . . of an employee is exclusive and instead of all other liability of the United States . . . because of the injury or death in a direct judicial proceeding, in a civil action, or in admiralty, or by an administrative or judicial proceeding under a workmen's compensation statute or under a Federal tort liability statute.

5 U.S.C. § 8116(c).

Because our circuit has not said whether a plaintiff can recover for an injury under both FECA and the Rehabilitation Act, we look to how other circuits have handled similar cases. *Nichols v. Frank*, 42 F.3d 503 (9th Cir. 1994), is analogous to this case. In that case a deaf-mute woman was repeatedly forced to perform oral sex on her supervisor. She received compensation under FECA for post-traumatic stress disorder that she suffered as a result of this treatment. *Id.* at 515. The Ninth Circuit held that FECA was the exclusive remedy for this work-related injury. *Id.* Nevertheless, it found that intangible harms caused by sex discrimination are not injuries within the meaning of FECA and that therefore Nichols could recover for such harms under Title VII. Similarly, Szedlock has suffered two distinct injuries. Her hearing loss is a work-related injury covered by FECA, *see* § 8101(5) (stating that an "injury" includes, among other things, "injury by accident" and "a disease proximately caused by the employment"), regardless of whether the CIA was in any way at fault. Her failure to accommodate claim, however, is quite distinct. A claim for compensation for discrimination by the employer does not relate to an injury within the meaning of FECA. *See* § 8101(5); *Nichols*, 42 F.3d at 515. We agree, therefore, with the district court that FECA is Szedlock's exclusive compensatory remedy for her work-related hearing loss.

### III.

Szedlock next argues that the district court erred in determining that the statute of limitations prevented her from bringing failure to accommodate claims related to CIA actions prior to September 30, 1996. Szedlock was required by law to contact an EEO counselor within forty-five days of any discriminatory act. 29 C.F.R. 1614.105(a)(1). She did not contact the CIA's EEO until May 20,

1997. The district court nevertheless ruled that she could bring any claims that arose after she began Position 6 on September 30, 1996, even though the forty-five day rule, strictly applied, would have left some events outside the statute of limitations. The CIA does not appeal this decision.

Szedlock argues that her earlier claims are timely because, along with the post-1996 events, they are part of a practice or a continuing violation. The Supreme Court's ruling in *National Railroad Passenger Corp. v. Morgan*, 122 S. Ct. 2061 (2002), however, makes clear that unless the plaintiff alleges a hostile work environment (which Szedlock did not do), each instance of discrimination is a discrete act. *Id.* at 2072-73. The *Morgan* decision controls this case. Early discriminatory actions by the CIA cannot be made timely simply because they resemble later discriminatory actions. *See id.* at 2072. We therefore affirm the district court's decision that Szedlock's claims arising from conduct of the CIA prior to September 30, 1996 are time-barred.

IV.

Finally, Szedlock argues that the district court erred in deducting ninety-four percent of her Federal Employees' Retirement System (FERS) benefits from her backpay award. FERS provides, among other things, for payments of retirement benefits to those who are forced to leave government employment early because of a disability. *See* 5 U.S.C. § 8451 et seq. The program is funded by a combination of payments from the federal government and from the employee. *See* 5 U.S.C. § 8422. In Szedlock's case six percent of the benefits she received following her disability retirement are attributable to her own contributions. The remainder, which was deducted from her backpay award, was attributable to the government's contribution. The CIA does not challenge the district court's decision not to deduct the six percent of the benefits attributable to Szedlock's contributions. Szedlock, however, challenges the deduction of the portion of her retirement benefits associated with the CIA's contributions. Because she contributed to FERS, Szedlock claims, the benefits are collateral and therefore are not duplicative of her backpay award. We disagree.

In *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 966 n.10 (4th Cir. 1985), we held that collateral funds are "those received from a source

distinct from the employer." If the funds are not collateral, we said, they are deducted from backpay if the payment "would not have been made had the employee continued working." *Id.* at 966. To do otherwise would "exceed[ ] the damages necessary to make the plaintiff whole, and failure to offset it would necessarily lead to a windfall." *Id.*

Szedlock claims that FERS benefits are, in fact, collateral because her contributions to FERS accounted for roughly six percent of the benefits she is receiving. This case, she says, is therefore analogous to *National Labor Relations Board v. Gullet Gin Co.*, 340 U.S. 361 (1951). There, the Supreme Court determined that unemployment benefits were collateral and did not have to be deducted from backpay; the fact that the employer paid for some part of the unemployment benefits through its contributions did not prevent the funds from being collateral. *Id.* at 364. At the very least, Szedlock concludes, the fact that she contributed to the fund means that the FERS benefits *may* be collateral, and we should adopt the Fifth Circuit's multi-part test to assess whether the benefits are collateral. *See Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 932-33 (5th Cir. 1992) (concluding that, in determining whether funds are collateral, the court should consider factors such as (1) whether the employee contributed to the fund; (2) whether the plan is the result of collective bargaining; (3) whether the benefits cover injuries caused by both work and non-work activities; (4) whether the benefits are contingent on the employee's length of service; and (5) whether the plan's language discusses set-offs against judgments in tort actions).

We believe, however, that FERS benefits are not "received from a source distinct from the employer," *Fariss*, 769 F.2d at 966 n.10, and therefore are not collateral under *Fariss*. *Gullet Gin* does not require a different result. Although employers contributed funds to the unemployment system in *Gullet Gin*, the benefits were paid by the state, not the employer, and therefore were collateral. Here, both the benefits and the backpay come from the same source—the federal government. The fact that Szedlock contributed to FERS does not make these benefits collateral. It may be that at some point the employee's share of the contributions would so eclipse the government's share that we would have to consider whether the funds had become collateral, but we are satisfied that a six percent contribution does not make

this such a case. *Cf. Phillips*, 953 F.2d at 931 (explaining that it would not undertake its multi-part analysis when the entire benefit comes from the federal government). The district court was therefore correct in deducting ninety-four percent of Szedlock's FERS benefits from her backpay award. *See also* 5 C.F.R. § 550.805(e).

Given this holding, Szedlock asks us to remand the case for a recalculation of her FERS benefit that would take into account the two additional years of service for which she was awarded backpay. Szedlock, however, failed to raise this calculation issue below. Because the failure to correct this error—if there is one—does not rise to the level of a denial of fundamental justice, *see Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985), we deny Szedlock's request for remand.

## V.

The CIA cross-appeals, urging us to grant it judgment as a matter of law based on its good faith defense. Because there is a jury verdict in favor of Szedlock, we review the evidence in the light most favorable to her. We will not reverse if there is evidence on which a reasonable jury could return a verdict for Szedlock. *See Price v. City of Charlotte*, 93 F.3d 1241, 1249-50 (4th Cir. 1996). The government stresses the efforts it made to find Szedlock an oral interpreter or a secretary who could use an appropriate note taking system, *see e.g.*, J.A. 261-64, 317, 416-17 (testimony on the effort to find a notetaker); J.A. 415-16, 470-73, 476-77 (testimony on the effort to find an oral interpreter). Szedlock herself acknowledged that the CIA's efforts to find someone to act as a dedicated notetaker for her were sincere. While we agree with the district court that the CIA presented considerable evidence to support its good faith defense, making this a close case, a reasonable jury could have still concluded that the CIA did not make a good faith effort. The jury may have taken note of the fact that the CIA did not provide Szedlock with a sign language interpreter who also mouthed the words when one might have been available. The jury may also have believed that the CIA should have made the notetaker position a full-time position in an effort to attract more candidates. It may also have been persuaded that the CIA could have hired a new employee and then provided training in oral interpretation to ensure that Szedlock's disability was accommodated. While we

also believe that the good faith question is a close one, a reasonable jury could have decided that the CIA's failure to make these efforts demonstrated that it was not acting in good faith. Accordingly, we reject the CIA's cross-appeal.

## VI.

The judgment of the district court is affirmed.

*AFFIRMED*