Patty EASTON; Peggy Maarup; and Maria Scott, Plaintiffs,

v.

CROSSLAND MORTGAGE CORP., a corporation; Betsy Lamonte, an individual; Lorene Washington, an individual, Defendants.

Betsy LAMONTE; and Lorene Washington, Counter-Claimants

v.

Patty EASTON; Peggy Maarup; and Maria Scott, Counter-Defendants.

No. CV 94–3165 R.

United States District Court, C.D. California.

Oct. 12, 1995.

---

Henry Blockman, Sherman Oaks, California, for Plaintiffs.

Cynthia E. Gitt, Lester F. Aponte, Judith L. Baxter, Epstein Becker & Green, Los Angeles, California, for Defendants.

## OPINION AND JUDGMENT

REAL, District Judge.

Plaintiffs Patty Easton ("EASTON"), Peggy Maarup ("MAARUP") and Maria Scott ("SCOTT") bring suit against their former employer and supervisors for gender discrimination in employment on the basis of sexual harassment. All the other claims are derivative of the allegations that give rise to the charges of gender discrimination. What makes this case somewhat different than most cases of sexual harassment is that the charges advanced by the female employees are leveled at their female supervisors.

The defendants brought a motion for summary judgment against SCOTT and a motion to dismiss with prejudice against EASTON and MAARUP. The court, *sua sponte*, treated the motion to dismiss as a motion for summary judgment. For the following reasons, the court granted summary judgment for the defendants against the plaintiffs and dismissed all defendants' counterclaims.

## I. FACTS

All the plaintiffs were formerly employed in the Glendale office of defendant Crossland Mortgage Corporation ("CROSSLAND"). EASTON, hired in December 1992, was employed as a senior underwriter. MAARUP and SCOTT were employed as account executives, that is, outside salespersons. MAARUP began working for CROSSLAND in April 1991 and SCOTT began in March 1992. There is no dispute that on November 9, 1993, EASTON was terminated from her employment for poor performance. The follow-

ing December 28, both MAARUP and SCOTT resigned their positions and joined EASTON at her new employment.

During the plaintiffs' tenure at CROSS-LAND'S Glendale office, the office had approximately 15 employees, all but two of whom were women. The branch office was managed by a woman, defendant Betsy Lamonte ("LAMONTE"). LAMONTE was also a vice president of CROSSLAND. All the plaintiffs were subject to supervision by LAMONTE. Another woman, defendant Lorene Washington ("WASHINGTON"), was operations manager. In her position, WASHINGTON supervised the contract underwriters, which included EASTON. MAARUP and SCOTT, being account executives, did not report to WASHINGTON.

From the spring of 1991 until November 1993, LAMONTE and WASHINGTON engaged in conduct and language that the plaintiffs contend amounted to sexual harassment. Many of the incidents complained of by the plaintiffs arose from several discussions concerning female breasts and buttocks which occurred in the office. LAMONTE, WASHINGTON and at various times other female employees, including the plaintiffs, would engage in candid dialogue about their own and each other's bodies. The tone of these discussions ranged from serious exchanges of information to vulgar horseplay.

One such discussion occurred in February of 1993. At about 2:00 p.m. during normal business hours, LAMONTE locked the front door of the office so that she, WASHING-TON, EASTON, MAARUP and two other female employees could use a lobby mirror undisturbed. A discussion had been taking place concerning the shape and size of EA-STON'S legs and breasts in light of her being overweight. LAMONTE expressed curiosity to know whether EASTON'S "boobs" were bigger than her own. At LA-MONTE'S urging, EASTON stood in front of the mirror and lifted her blouse. LA-MONTE, wearing a shear top, stood next to EASTON and put her arm around EA-STON'S shoulders. LAMONTE remarked on the manner in which their nipples pointed and discussed a deformity of her own breast.

Another example of this reoccurring topic of conversation was WASHINGTON'S open and vocal concern over the size of her own breasts. She massaged them in front of employees and asked if they thought her breasts were too small. SCOTT saw her do this three times. EASTON and MAARUP reported seeing this behavior frequently. LAMONTE joked that the office staff should all chip in $100 each to buy WASHINGTON some breast implants. Perhaps by way of compensation, in front of employees LA-MONTE would occasionally touch WASH-INGTON'S rear end while loudly complimenting her on "her nice ass."

There were other instances when LA-MONTE and WASHINGTON used demonstrative acts to punctuate these discussions. For instance, several times WASHINGTON lifted her top and bra and exposed her bare breasts to EASTON and MAARUP while asking them for their opinion regarding the appearance and adequacy of her breasts and nipples. On one occasion in her private office, LAMONTE removed her top and bra and exposed her breasts to MAARUP in order to illustrate their shape.

About two weeks after SCOTT had started working at the office, WASHINGTON asked SCOTT if she would like to see WASHING-TON'S breasts. As WASHINGTON tugged at her blouse, SCOTT declined and walked away. Shortly thereafter, WASHINGTON again approached SCOTT, this time requesting to see SCOTT'S breasts. WASHING-TON explained it was a prerequisite of employment that all the women show their breasts. SCOTT was understandably taken aback at first, but then realized WASHING-TON was not serious. MAARUP and another female employee were present during this exchange. The female employee testified that this comment was WASHINGTON'S attempt at humor. All the plaintiffs testified that they were never required by the defendants to show their breasts or any other private part of their bodies in order to continue working at CROSSLAND. Subsequently, SCOTT was never asked by any one in the office to show her breasts.

Another incident that SCOTT claimed made her "uncomfortable" was when she changed her clothes in front of LAMONTE and co-plaintiff EASTON. LAMONTE had

given SCOTT some clothes and asked her to try them on using LAMONTE'S private office as a dressing room. LAMONTE and EASTON were in the office while SCOTT tried on the clothing. LAMONTE made no sexual remarks about SCOTT'S body on this occasion. SCOTT admits that, except for that one occasion with WASHINGTON, her body was not discussed by the defendants.

SCOTT claims, however, that on another occasion she was pinched on the rear end as she walked down a hallway. She turned around and saw LAMONTE and WASHINGTON standing in the hall. She did not see who pinched her, nor did LAMONTE or WASHINGTON give her any indication that they had done the act or even that they were aware of her presence.

SCOTT further testified that occasionally LAMONTE and WASHINGTON teased her about her appearance by insinuating she was dressed in a way that signaled she had a hot date with a man. MAARUP was also subject to the same types of teasing insinuations about her appearance. In MAARUP'S case, though, LAMONTE and WASHINGTON did sometimes make specific comments regarding her breasts and buttocks. On one occasion, MAARUP was pinched on the rear end by LAMONTE. EASTON, too, was teased by LAMONTE and WASHINGTON when they sometimes flicked up EASTON'S dress so that the two women could, ostensibly, determine "the color of her underwear." EASTON took to wearing pants on account of the defendants' conduct.

Another topic of conversation at the Glendale office was sex. Many of these conversations were instigated by LAMONTE or WASHINGTON. They would begin by inquiring into the sexual practices and experiences of an employee or by remarking on their own carnal activity or lack thereof. The defendants would ask the women things like, "Do you masturbate?" "How often do you have sex?" or "Do your reach orgasm?" On two or three occasions EASTON, MAARUP and SCOTT were each subjected to such questioning and responded to these inquires. SCOTT claims she was reticent about speaking on these matters; however, she did answer the questions when posed and listened to the answers of others who were asked similar questions. The women never pro-

tested against these inquires nor attempted to leave when these discussions began. According to SCOTT, at least one of these sex talks in which she participated was started by MAARUP.

The plaintiffs each claim offense at the rough language used by LAMONTE in the workplace. For a period of several months, LAMONTE had a habit of greeting the staff in the morning by saying, "Good Morning, bitches." When speaking to an employee, she would occasionally call her a bitch or a "BSW." Bitch and BSW derive from the phrase "bitch, slut, whore" which originated from an *L.A. Law* episode dealing with Tourette's syndrome. LAMONTE addressed the plaintiffs by these terms at various times; LAMONTE also referred to WASHINGTON as "her bitch" and WASHINGTON responded in kind. Once, EASTON and MAARUP were told by LAMONTE to purchase a cake with "To a BSW" written on top for a farewell office party for a woman who was going to work at another CROSSLAND office. Employees understood these words were spoken as a joke or used as crass terms of endearment, and not spoken out of anger or harassment of any kind. After a period of time, the joke wore thin and LAMONTE did not use these terms as often.

Further, MAARUP identified two other instances when LAMONTE used vulgar language in her presence in a way that she claims embarrassed her. On one occasion, LAMONTE remarked to MAARUP that a certain male's presence caused MAARUP "to cream her pants." On the other occasion, LAMONTE asked a male outside service person if the color of the skin on his arm matched that on his penis. This exchange took place in front of MAARUP.

The bawdy atmosphere in the office was epitomized by WASHINGTON'S forty-first birthday bash in November 1993. SCOTT and MAARUP were in the office that day EASTON had already been terminated. LAMONTE had told two employees, one male and one female, to buy "knickknacks" and "fun things" to use in decorating WASHINGTON'S office. LAMONTE specifically asked that they purchase a dildo for WASHINGTON as a joke gift. The result of this shop-

ping spree left WASHINGTON'S office decorated with pictures of nude men, condoms and a ring-toss game that used the inflated penis of a male blow-up doll as the post. MAARUP, aware of the decor in WASHINGTON'S office, chose not to attend. SCOTT, however, did go to the party for approximately ten minutes because she was curious to see WASHINGTON'S reaction to the decorations and LAMONTE'S gift.

EASTON, MAARUP and SCOTT testified that LAMONTE and WASHINGTON never expressly or impliedly asked any of them to engage in any sexual activity. They testified that they did not construe LAMONTE'S and WASHINGTON'S offensive conduct as being any invitation to have sex. Further, the plaintiffs admit they do not know if LAMONTE and WASHINGTON were even interested in having sex with the plaintiffs, with each other, or if they were lesbians. Both LAMONTE and WASHINGTON were married during the relevant time period.

The plaintiffs also admitted that the conduct alleged was not perceived as a threat to their continued employment or to the receipt of benefits flowing from that employment. Nor were their jobs put in jeopardy by LAMONTE'S and WASHINGTON'S behavior. Further, EASTON, MAARUP and SCOTT make no claims that they were forced or required to participate in any of the discussions or conduct they claim to be offensive in order to maintain their positions or to gain advancement opportunities. Further, no evidence was presented that would show the plaintiffs' work suffered because of the sexually charged atmosphere created by the defendants.

At no time during their employment at CROSSLAND did EASTON, MAARUP or SCOTT ever complain to anyone about these incidents. They did not advise LAMONTE, WASHINGTON, LAMONTE'S supervisors, CROSSLAND'S upper management or its human resources department that they were offended and disturbed by defendants' conduct. Both EASTON and MAARUP had numerous contacts with CROSSLAND'S human resources department concerning other matters, yet neither of them sought help for their now claimed sexual harassment, from the people they knew there.

Opportunities outside normal channels of corporate communication arose that would have allowed the women to lodge their complaints. EASTON attended a September 1993 job performance counseling session and several subsequent performance related meetings prior to her termination. She never mentioned the alleged harassment at those meetings nor gave any indication that her work performance was poor because the atmosphere at the office was oppressive. Further, on two occasions during the summer of 1993, SCOTT drove the president of CROSSLAND and LAMONTE'S boss to the airport. On neither of those occasions did she broach the subject with them.

Rather than expressing their displeasure with their working environment, the plaintiffs never expressed or gave any outward sign to the defendants that the plaintiffs were uncomfortable with defendants' conduct and language or that the plaintiffs wanted to be excluded from the sexual banter in the office. EASTON, MAARUP and SCOTT behaved in a manner that would induce LAMONTE and WASHINGTON to be friendly and socialize with them. MAARUP admitted to going out of her way to be nice to the two women by "pretend[ing] to be their friend" and SCOTT conducted herself so that she would "be in good" with LAMONTE and WASHINGTON. Neither LAMONTE nor WASHINGTON ever threatened the plaintiffs with reprisals or termination if they did not join the festivities going on in CROSSLAND'S Glendale office.

None of the plaintiffs tried to seek alternative employment while working for CROSSLAND. EASTON testified that she "loved" her job, and was "devastated" by her termination. She stayed at the Glendale office despite receiving more than 60 telephone calls from headhunters in 1993 advising her of employment opportunities with other mortgage companies. Even though both MAARUP and SCOTT identified instances of offensive conduct occurring within the first few weeks of starting at CROSSLAND, MAARUP remained at the Glendale office for two and one half years and SCOTT stayed one and one half years. A poor job market was not a factor in the plaintiffs'

decision to stay at CROSSLAND because, during the relevant time period, jobs were readily obtainable in the mortgage industry for persons with similar work experience at their job level.

Within two weeks of being terminated in November 1993, EASTON had secured a job as an underwriter with another mortgage company. EASTON and a recruiter from this new company solicited MAARUP and SCOTT to come work there. Once they were offered positions at the new firm, they resigned from CROSSLAND.

## II. PROCEDURAL HISTORY

On April 6, 1994 plaintiffs filed their first amended complaint in the Los Angeles Superior Court.[1] The complaint alleged sexual harassment, hostile work environment and sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), California Fair Employment and Housing Act, Cal.Gov.Code § 12900 *et seq.* ("FEHA"), and the federal and California constitutional rights of privacy.[2] The complaint also contained causes of action for wrongful termination, assault and battery and invasion of privacy. It was served on the defendants on April 18. On May 13, the defendants removed the action to federal court on the basis of federal question jurisdiction. On May 20, defendants filed their answer and asserted counterclaims against the plaintiffs for defamation and intentional infliction of emotional distress for statements made publicly by plaintiffs outside the litigation privilege.

After considerable discovery, defendants brought a motion for partial summary judgment on all the claims brought by plaintiff SCOTT. At the same time defendants brought a motion for partial summary judgment on their counterclaims for defamation. After a hearing on December 5, 1994, the court granted defendants summary judgment

motion against SCOTT on all her claims, but denied defendants' summary judgment on their defamation counterclaims.

The matter proceeded to trial on the remaining claims and counterclaims. Shortly thereafter, a stipulation was submitted by the parties wherein the two remaining plaintiffs, EASTON and MAARUP, voluntarily dismissed all their claims except EASTON'S claim for sexual harassment and MAARUP'S claims for sexual harassment and wrongful termination. The court agreed to the stipulated dismissal. Trial was set to begin on February 21, 1995.

On February 17, 1995, the court heard 32 motions *in limine* and issued rulings on all but three. On February 21, just before the venire was called, plaintiffs' counsel tried to revisit some of the court's rulings on the motions *in limine*. After a colloquy with the court and opposing counsel, plaintiffs' counsel admitted that in light of the court's evidentiary rulings that he lacked any evidence to prove "gender-based sexual harassment as the Court has interpreted [sic] .... [or] that specific acts of sexual harassment were related or connected to specific tangible job benefits." Tr. 6:4–7 (Feb. 21, 1995). The court interpreted this admission to mean that plaintiffs could not prove quid pro quo sexual harassment. *Id.* at 6:18–19. Defense counsel moved to dismiss for failure to state a claim. The court took the trial off calendar and set a briefing schedule for the parties.

Defendants' motion to dismiss came on for hearing May 8. In light of the extensive record, body of evidence and briefing of the issues, the court decided to consider matters outside the pleadings and treat this motion as one for summary judgment. Fed.R.Civ.P. 12(b). It then granted summary judgment against both EASTON and MAARUP on their claims for sexual harassment and

---

1. This action was originally filed in the Los Angeles court on March 31, 1994. The original complaint was not served on the defendants. The first amended complaint is the operative pleading governing this action.

2. Neither the federal nor California constitution provide a cause of action for violation of the right of privacy based on the sexual harassment claims made in the complaint. To the extent that

California's common law privacy torts are being alleged, there is no authority that would support the imposition of liability based on the facts of this case. The tort of privacy, pursuant to any its four theories of liability, does not reach inquiries into an individual's private life made in the context of private conversations among a small group of friendly persons. *See Porten v. University of San Francisco,* 64 Cal.App.3d 825, 134 Cal.Rptr. 839 (1976).

MAARUP'S claim for wrongful termination. In addition, the court dismissed the defendants' counterclaim.[3]

## III. ANALYSIS

### A. Jurisdiction

■ This court has jurisdiction over this action by virtue of the federal question raised by the Title VII claim for relief in the complaint.[4] 28 U.S.C. § 1331. The court has supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(a).

### B. Summary Judgment Standard

■ This matter was adjudged on the basis of what became two defense motions for summary judgment. On summary judgment, the burden is on the moving party to establish that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); British Airways Bd. v. Boeing Co., 585 F.2d 946 (9th Cir.1978), cert. denied, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). All the evidence and the inferences from the underlying facts must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986). If the nonmoving party carries the burden of proof at trial, then the moving party does not have to negate the nonmoving party's claim to prevail on summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 274 (1986). In this instance, the moving party's burden is "discharged by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's

case." Id. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275.

### C. Title VII and FEHA Claims

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Similarly, FEHA makes it an unlawful employment practice "[f]or an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, or sex of any person, . . . to discriminate against the person in compensation or in terms, conditions or privileges of employment." Cal.Gov't Code § 12940(a) (West Supp.1995). FEHA specifically prohibits an employer, among others, from harassing an employee "because of . . . sex." Id. § 12940(h)(1). "For [the] purposes of this subdivision, 'harassment' because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions." Id. § 12940(h)(3)(C).

■ Although their wording differs in some particulars, Title VII and FEHA are treated by California courts as analogous. See Flait v. North American Watch Corp., 3 Cal.App.4th 467, 4 Cal.Rptr.2d 522 (1992); Fisher v. San Pedro Peninsula Hosp., 214 Cal.App.3d 590, 608, 262 Cal.Rptr. 842 (1989). Federal law is often relied upon by California courts in rendering their decisions, especially in the absence of case law or California Fair Employment Housing Commission ("FEHC") administrative decisions. Fisher,

---

3. During the course of proceedings in this matter, the defendants represented to the court their willingness to voluntarily dismiss the counterclaims if this matter could be resolved without proceeding to trial. As that condition has been met, the court construes those earlier representations as a request for voluntary dismissal of the counterclaims which this court grants.

4. In August 1994, plaintiffs brought a motion to remand based on lack of subject matter jurisdiction. Plaintiffs claim that their failure to exhaust administrative remedies available through the EEOC divests this court of jurisdiction over the

matter. The court denied this motion. The Ninth Circuit has made it clear that "exhaustion of administrative remedies is not jurisdictional but is merely a condition precedent to suit which a defendant may waive or be estopped from asserting." Stache v. International Union of Bricklayers, 852 F.2d 1231, 1233 (9th Cir.1988), cert. denied 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 32 (1898). The defendants did not raise this issue on the motion to remand, nor did they assert it in their subsequent dispositive motions. Therefore, the court deems the defendants to have been waived this condition precedent.

214 Cal.App.3d at 606, 262 Cal.Rptr. at 850. As will be demonstrated below, for the purpose of resolving these summary judgments, there are no material differences between federal and state law regarding the plaintiffs' claims of sexual harassment.

### 1. Sexual Harassment Theories of Liability

■ Both federal and California law recognize two theories of sexual harassment liability: *quid pro quo* and court created hostile work environment in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (Title VII); *Mogilefsky v. Superior Ct.* 20 Cal.App.4th 1409, 26 Cal. Rptr.2d 116 (1993) (FEHA). *Quid pro quo* claims are the archetypical charge of sexual harassment in the workplace. A plaintiff can prevail on a *quid pro quo* theory by showing that her employment, benefits derived from her employment, or avoidance of the adverse conditions of her employment were implicitly or expressly conditioned upon her acceptance of a supervisor's sexual advances. *Nichols v. Frank,* 42 F.3d 503, 511 (9th Cir.1994); *accord Mogilefsky,* 20 Cal.App.4th at 1414, 26 Cal.Rptr.2d at 118.[5]

■ By contrast, a hostile environment theory asserts that "discrimination based on sex has created a hostile or abusive work environment." *Meritor Savings Bank,* 477 U.S. at 66, 106 S.Ct. at 2405, 91 L.Ed.2d at 59. The plaintiff must show that the employer's behavior was "sufficiently severe or pervasive 'to alter the conditions of [her] employment.'" *Id.* at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60; *accord Fisher,* 214 Cal. App.3d at 609, 262 Cal.Rptr. at 852. "[A] hostile environment exists when an employee can show (1) that he or she, was subjected to

sexual advances, request for sexual favors, or other verbal or physical conduct of a sexual nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison v. Brady,* 924 F.2d 872, 875 (9th Cir.1991).

■ An objective totality of the circumstances test is used to determine the existence of a hostile environment. *Harris v. Forklift Sys., Inc.,* — U.S. —, — – —, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295, 302 (1993). A nonexhaustive list of circumstances would include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.; see also Fisher,* 214 Cal.App.3d at 610, 262 Cal.Rptr. at 852.[6] The inquiry is whether a "reasonable person" would find the circumstances pervasive enough to create a hostile or abusive atmosphere. *Harris,* — U.S. at — – —, 114 S.Ct. at 370–71, 126 L.Ed.2d at 302. *But see Ellison,* 924 F.2d at 879 (adopting a reasonable victim standard where the gender of the "reasonable person" is the gender of the complainant); *accord Fisher,* 214 Cal.App.3d at 609 n. 6, 262 Cal.Rptr. at 852 n. 6.

■ Aside from the elements of the claim, there are two other legally significant distinctions between the *quid pro quo* and hostile environment theories. First, under a hostile environment theory, the plaintiff does not need to prove the loss of tangible or economic job benefits. *Meritor Savings Bank,* 477 U.S. at 64, 106 S.Ct. at 2404, 91

---

**5.** Both the Ninth Circuit and California court have rejected the overly formalistic five-part test for *quid pro quo* claims popular in a number of other circuits. The five elements are (1) whether the employee belongs to a protected group; (2) whether the employee was subjected to unwelcome sexual harassment; (2) whether the harassment complained of was based on sex; (4) whether the employee's reaction to the harassment affected the tangible aspects of the employee's compensation, terms, conditions or privileges of employment; (5) whether there was *respondeat superior. Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982). Six other circuits use the same or similar version of this test. *See*

*Nichols,* 42 F.3d at 511 n. 5 (for a list of the cases from the various circuits).

**6.** *Fisher* lists four slightly different factors to consider:

(1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all the offensive conduct occurs; and (4) the context in which the sexually harassing conduct occurred.

*Id.* at 610, 262 Cal.Rptr. at 852.

**1378**

L.Ed.2d at 58. FEHA provides for this in the statute itself. Cal.Gov't Code § 12940(h)(1) (West Supp.1995); *Mogilefsky,* 20 Cal.App.4th at 1414, 26 Cal.Rptr.2d at 118. The harm suffered by a victim of a hostile work environment is loss of her "right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. at 2405, 91 L.Ed.2d at 59.

■ The second distinction is that a plaintiff may be able to maintain a hostile environment claim even though the conduct complained of was not sexual in nature but constituted harassment directed at the victim because of her gender. In other words, the plaintiff is alleging that *but for* her gender, she would not have been subject to nonsexual abusive or oppressive conduct. FEHA is clear that gender-oriented harassment is actionable. Cal.Gov't Code § 12940(h)(3)(C).

The Ninth Circuit has not yet reached a determination of the issue; however, it has left open the door for a claim based on gender-oriented harassment. *Ellison,* 924 F.2d at 875 n. 5. In a recent decision that touched upon the subject, the appellate court implicitly indicated that a hostile environment claim relying on gender-oriented harassment could be maintained. *See Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1462 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995) ("Trenkle was abusive to men and women alike; however, his abusive treatment and remarks to women were of a sexual and gender-specific nature."). The *Steiner* court did not distinguish between harassing conduct that was sexual in nature from that which was gender-based, yet it relied on instances of both in reaching its decision.

Moreover, new regulations proposed by the Equal Employment Opportunity Commission ("EEOC") would include within the ambit of sexual harassment "harassment due to gender-based animus." *See Fox v. Sierra Devel. Co.,* 876 F.Supp. 1169 (D.Nev.1995) (referring to proposed 29 C.F.R. §§ 1609.1, 1609.2, 58 Fed. Reg. 51266 (1993)). Certainly protection of employees from nonsexual yet abusive conduct directed towards them because of their gender promotes the anti-discrimination policies at the core of Title VII. Consequently, I believe the Ninth Cir-

cuit would find gender-oriented harassment to satisfy the first element of a hostile environment claim.

### 2. *Same-Gender Harassment*

■ There is a threshold issue in this lawsuit as to whether Title VII and FEHA recognize a sexual harassment claim wherein the victim and the harasser are the same gender. The law, both federally and in California, is unsettled. Neither the California Supreme Court nor the Ninth Circuit have addressed this issue. However, I believe that if this issue was before either judicial body, both would hold that a *quid pro quo* claim can be maintained in a same-sex harassment lawsuit and is not barred as a matter of law. Simple harassment even though sexual terms are also a same gender workplace would raise a serious question of whether or not this type of conduct could amount to sexual harassment in terms of the application of Title VII or FEHA.

■ First, the plain language of Title VII and FEHA does not preclude a same-gender sexual harassment claim for relief. The statutes employ the unmodified word "sex" in describing the kind of discrimination that is prohibited. If heterosexual sexual harassment was the sole kind of sexual harassment Congress sought to outlaw, they could have written the statute to only encompass claims brought by members of the opposite sex of the harasser. "Where the statutory language is clear, our sole function is to enforce it according to its terms." *Rake v. Wade,* 508 U.S. 464, ——, 113 S.Ct. 2187, 2191, 124 L.Ed.2d 424, 433 (1993). But the plain language is addressed as "discrimination" because of gender.

Courts that have held Title VII does not state a claim for relief in same-sex harassment cases have ignored the plain language of the statute and undertaken an unnecessary excursion into the mist shrouded netherworld of congressional intent. The only circuit to directly address the issue tersely held that " 'harassment by a male supervisor against a male subordinate does not state a claim under Title VII even though the harassment has sexual overtones.' " *Garcia v. Elf Atochem N. America,* 28 F.3d 446, 451–52 (5th Cir.1994) (quoting from an earli-

er unpublished Fifth Circuit opinion). Not providing any rationale of its own, the *Garcia* court apparently relied on *Goluszek v. H.P. Smith,* 697 F.Supp. 1452 (N.D.Ill.1988), which it cited with approval following the above referenced quote.

In *Goluszek,* the court explored the "underlying concerns of Congress" to determine that Title VII did not apply to a male versus male hostile environment claim. It found that any discrimination that might arise under these conditions was not the "discrimination Congress was concerned about when it enacted Title VII." *Id.* at 1456. Title VII reflects Congress' concern over discrimination "stemming from an imbalance of power and an abuse of that imbalance by the powerful which results in discrimination against a discrete and vulnerable group." *Id.* Accordingly, the only type of sexual harassment actionable under Title VII results for "words or actions that [say] the victim is inferior because of the victim's sex." *Id.* The court found it impossible for that to occur when the victim and the offender shared the same gender.

This empowerment rationale appears to be the basis upon which other federal district courts have barred same-sex sexual harassment claims. *See Hopkins v. Baltimore Gas & Elec. Co.,* 871 F.Supp. 822 (D.Md.1994) (Title VII . . . evinces a congressional intent to "strike at the entire spectrum of *disparate treatment of men and women. . . .* Where, as here, the alleged harasser and the alleged victim are both of the same gender, the language of the statute would be strained beyond its manifest intent. . . ."); *Vandeventer v. Wabash Nat'l Corp.,* 867 F.Supp. 790 (N.D.Ind.1994) ("Title VII is aimed at a gender-based atmosphere; an atmosphere of oppression by a 'dominant' gender.").

As logically appealing this argument may be, it does not reflect the current state of anti-discrimination jurisprudence. *See Prescott v. Independent Life & Accident Ins. Co.,* 878 F.Supp. 1545 (M.D.Ala.1995). In the analogous area of racial discrimination, it is well-settled that people of color are not the only individuals that can claim the protection of Title VII. Members of the "dominant," "oppressive" white majority can rely on Title VII to shield them from racial discrimination in private employment. *See McDonald v.*

*Santa Fe Trail Transp.,* 427 U.S. 273, 279, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493, 500 (1976). Besides, no language in the Supreme Court's *Meritor Savings Bank* or *Harris* opinions could be interpreted as justifying an absolute bar of same-gender sexual harassment claims. Nor do they create same gender discrimination by harassment in the workplace.

Recently, the Ninth Circuit has given some indication that it would find same-gender sexual harassment claims legally cognizable. In *Steiner,* the male harasser was verbally abusive to male and female employees alike. The defense argued that because the supervisor "used sexual epithets equal in intensity and in an equally degrading manner against male employees" as those he directed towards women, he was an equal opportunity harasser and not in violation of Title VII. *Steiner,* 25 F.3d at 1464. The court rejected this argument. *Id.* Moreover, the court added that "although words from a man to a man are differently received than words from a man to a woman, we do not rule out the possibility that *both* men and women working at Showboat have viable claims against [the supervisor] for sexual harassment." *Id.*

The trend at the district court level seems to favor this approach to same-gender harassment claims. *See McCoy v. Johnson Controls World Servs.,* 878 F.Supp. 229 (S.D.Ga.1995) (denied 12(b)(6) motion on a female against female hostile environment claim); *Prescott, supra,* (Male homosexual *quid pro quo* claim viable); *Ryczek v. Guest Servs.,* 877 F.Supp. 754 (D.C.1995) (female homosexual *quid pro quo* and hostile environment claims legally cognizable); *Fox, supra,* (male homosexual *quid pro quo* and hostile environment claims viable); *Joyner v. AAA Cooper Trans.,* 597 F.Supp. 537 (M.D.Ala. 1983), *aff'd without opinion,* 749 F.2d 732 (11th Cir.1984) (male homosexual *quid pro quo* claim actionable); *Wright v. Methodist Youth Servs., Inc.,* 511 F.Supp. 307 (N.D.Ill. 1981) (same). While there is a dearth of case law on the issue, California courts interpreting FEHA are not adverse to recognizing a same-gender harassment claim. *See Matthews v. Superior Ct.,* 34 Cal.App.4th 598, 40 Cal.Rptr.2d 350 (1995) (male homosexual

*quid pro quo* and hostile environment claim viable); *Mogilefsky, supra,* (same). *But see Hart v. National Mortgage & Land Co.,* 189 Cal.App.3d 1420, 235 Cal.Rptr. 68 (1987) (FEHA does not apply because plaintiff failed to allege he was harassed "because of sex."). Each of these cases however posit a "quid pro quo" based on sexual preferences.

While there is no doubt that Congress enacted Title VII's gender provisions in order to balance the inequities, or worse, in the workplace what women were forced to endure by their male supervisors, it should be equally without question that Title VII's broad prohibitions forbid *any* individual, regardless of gender, who has the power to control the terms and conditions of another's employment and wield that power in a manner which discriminates against that employee because of his or her sex. Accordingly, the court rules that same-gender sexual harassment claims for relief, at least under a *quid pro quo* theory, are not precluded under Title VII or FEHA as a matter of law.

### 3. Quid Pro Quo Claims

■ As plaintiffs' counsel admitted on the eve of trial, plaintiffs have a complete failure of proof as to any *quid pro quo* claim for relief. The evidence adduced does not show any instances where either EASTON, MAARUP or SCOTT were propositioned for sexual favors by either LAMONTE or WASHINGTON. While MAARUP and SCOTT were told by the defendants that they looked "hot," and MAARUP'S breasts and buttocks were complimented by the defendants on several occasions, both plaintiffs concede they never interpreted these comments as indicating that LAMONTE and WASHINGTON wanted to have sex with them. There is no evidence that the defendants are lesbians. In fact, the record demonstrates just the opposite. LAMONTE'S and WASHINGTON'S sexual attraction to men was manifest by such evidence as the kinds of decorations chosen for WASHINGTON'S birthday party,[7] LAMONTE'S flirtatious questioning of the outside services employee and the numerous discussions these woman participated in concerning their own and other employees' heterosexual sexual experiences. Finally, the plaintiffs testified that they were not required to expose their breasts or other private parts in order to maintain their employment. Nor was their participation in the offensive conduct in the office implicitly or expressly tied to continued employment, a job benefit or the ability to avoid a job detriment. *Nichols,* 42 F.3d at 511. Therefore, summary judgement is appropriate on this issue.

### 4. Hostile Work Environment

■ For EASTON, MAARUP and SCOTT under this theory of liability, they must establish that the conduct of LAMONTE and WASHINGTON, when considered in its totality, created a "hostile work environment" because the plaintiffs suffered "discriminatory intimidation, ridicule and insult" on account of their gender. *Meritor savings Bank,* 477 U.S. at 65, 106 S.Ct. at 2405, 91 L.Ed.2d at 59. Using the factors set forth in *Harris* in conjunction with the three-prong test delineated in *Ellison,* the court's inquiry on these motions is to determine if there is a genuine dispute of material fact as to whether a reasonable woman would perceive the environment in the Glendale office as hostile or abusive because of his or her sex. Even drawing all inferences favorable to the plaintiffs, these claims must fail as a matter of law.

First, there are many facts that establish the plaintiffs were "subjected to ... verbal or physical conduct of a sexual [or gender-oriented] nature."[8] *Ellison,* 924 F.2d at 875. These facts could be perceived by a reasonable woman as being "intimidating, insulting or ridiculing." LAMONTE calling employees "bitch," "slut" or "whore," even if meant as a joke, or both defendants referring to female breasts as "boobs" could be reasonably perceived as being ridiculing. Having one's sexual practices and experiences

---

7. A year earlier, a group of women from the office celebrated Washington's 40th birthday by going to a male stripper club where Maarup claims she saw Washington "fondle" the male stripper.

8. The bracket material was added in light of expanded sexual harassment jurisprudence that would allow gender-oriented conduct as well as conduct of a sexual nature could form the basis of a hostile environment claim. *See* III.A.1. *supra.*

probed or the private parts of one's body discussed, without first volunteering or otherwise being a willing participant in the conversation, could be insulting to a reasonable woman. Having to frequently observe WASHINGTON massaging her breasts or LAMONTE caressing WASHINGTON'S backside could be considered reasonably offensive. Unwanted touching such as EASTON'S claim that she was subjected to having her skirts flipped up by the defendants or MAARUP'S claims that LAMONTE pinched her on the rear end could be reasonably perceived as insulting. Further, WASHINGTON and LAMONTE exposing their bare breasts to EASTON or MAARUP is conduct which a reasonable woman could find offensive and disgusting.

The second prong of *Ellison* states that the allegedly offensive conduct must be unwelcome. *Id.* The totality of the circumstances, undercut plaintiffs' claims that all the offensive conduct alleged was either unwelcome or sexual harassment. For instance, it defies common sense to find that LAMONTE'S subsequent questioning of SCOTT and MAARUP about there sex lives was unwelcome when MAARUP brought up the topic of conversation and SCOTT, there from the beginning of the discussion, chose to answer questions and listen to the other two talk on the subject rather than leave the room or make complaints of any kind.

Another example is SCOTT'S attendance at WASHINGTON'S birthday party. She can not maintain that the sexual conduct she observed at the party was offensive to her as sexual harassment. She could have chosen not to attend as did MAARUP. Instead, SCOTT voluntarily and willingly participated in the celebration in order to observe WASHINGTON'S reaction.

Likewise, the incident where SCOTT tried on clothing given to her by LAMONTE while LAMONTE and co-plaintiff EASTON remained in the room can not be considered sexual harassment. SCOTT willingly took the gift offered by LAMONTE and changed in front of them without expressing her need for privacy or leaving the room to change in another private place, such as the office restroom. Her claimed discomfort over having to change in front of the women was not enough for her to decline accepting LA-

MONTE'S gift, and it is not enough to turn this incident into actionable sexual harassment, particularly where no sex was discussed or intimated in any way.

The third prong of *Ellison* poses the question whether the conduct was "sufficiently severe or pervasive to alter the terms of the victim's employment and create an abusive working environment." *Id.* at 876. The plaintiffs experience a complete failure of proof as to this element. No evidence is adduced to show that the defendants' conduct altered, in any way, the terms or conditions of the plaintiffs' employment.

EASTON does not contest that she was fired because of poor work performance, nor did she assert during any of her pre-termination job counseling sessions that her work was suffering because of LAMONTE'S and WASHINGTON'S behavior. EASTON testified she "loved" her job, and was "devastated" when she was terminated. Moreover, MAARUP and SCOTT fail to show that their work suffered as a result of the defendants' behavior. MAARUP and SCOTT claimed they tried to avoid contact with LAMONTE and WASHINGTON as much as possible. This, however, did not adversely impact their job performance because, as outside salespersons, they were required to be out of the office most of the work week in order to drum up business. Neither of these women received poor job performances.

Indeed, the plaintiffs' evidence establishes that they behaved as though they had every intention of continuing to work at the Glendale office for as long as possible. The plaintiffs never complained to upper management about the unprofessional atmosphere in the Glendale office despite opportunities to do so. They did not seek alternative employment even though the job market was strong and, in EASTON'S case, she was being heavily solicited by headhunters to apply at other firms. MAARUP and SCOTT did not consider changing jobs until after EASTON solicited them to come work with her at the new firm.

Even the subjective evidence of the perceptions of plaintiffs of their workplace belies a finding of altered employment conditions resulting from an oppressive environ-

ment. EASTON, MAARUP and SCOTT testified that they never perceived the defendants' conduct as being threatening to their jobs or any benefits of their jobs. Nor did the women perceive the defendants' conduct was hostile or abusive towards them. The plaintiffs contend, however, that at times they felt uncomfortable with or became disgusted, embarrassed or insulted by the antics of LAMONTE and WASHINGTON. This is completely understandable. To say LAMONTE and WASHINGTON behaved in an unprofessional manner is to push the boundaries of understatement. However, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris,* —— U.S. at ——, 114 S.Ct. at 370, 126 L.Ed.2d at 302. Their own depositions demonstrate that the plaintiffs never subjectively perceived the environment as abusive. There was a mutual friendly relationship between plaintiffs and defendants that was not affected by the environment in the workplace.

Plaintiffs have not presented evidence to establish a factual basis or a genuine dispute of fact for all the elements of their hostile work environment claim under Title VII or FEHA. This is enough to grant summary judgment in favor of the defendants. There is, however, a more profound problem with plaintiffs' case. Where is the evidence of gender discrimination? The answer: There is none.

### 5. *Same–Gender Hostile Environment Claim Lacks Evidence of Gender Discrimination*

At the risk of stating the obvious, without discrimination there can be no Title VII violation. This bears keeping in mind when a court is adjudicating a same-gender hostile work environment case because the obvious can easily be overlooked. Title VII and FEHA are anti-discrimination statutes. They are not addressed to the rude and crude environments that can and unfortunately often exist in single gender workplaces.

▮▮▮▮ The statute forbids an employer to *"discriminate* against any individual ... because of ... sex." 42 U.S.C. § 2000e–2.

"Title VII affords employees the "right to work in an atmosphere free from *discriminatory* intimidation, ridicule and insult." *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. at 2405, 91 L.Ed.2d at 59 (emphasis added). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.... [T]he adjudicator's inquiry should center, dominantly, on whether the *discriminatory* conduct has unreasonably interfered with the plaintiff's work performance." *Harris,* —— U.S. at ——, 114 S.Ct. at 372, 126 L.Ed.2d at 304 (concurring, J. Ginsburg) (emphasis added).

Our shared common experience has taught us that the politics of gender do not exist in a vacuum. Title VII jurisprudence reflects this. "A complete understanding of the victim's view requires, among other things, an analysis of the different perspectives of men and women. Conduct that many men consider unobjectionable may offend many women." *Ellison,* 924 F.2d at 878. The reason for this disparity is that "many women share common concerns which men do not necessarily share." *Id.* at 879. Hence, men engaging in mild or non-touching sexual conduct in the workplace may perceive the conduct as harmless while the reasonable woman on the receiving end would find it oppressive. *Id.* In an all female context, however, this gender disparity of generalized perspectives is nonexistent. The environment, in effect, has become gender neutral and presumptively nondiscriminatory.

In the typical hostile environment case— that is, a male supervisor makes sexually suggestive remarks to a female employee— the conduct is presumptively discriminatory. The causal link between the supervisor's conduct and the victim's harassment is the victim's gender. But for the employee being female, the supervisor would not make the offending comments; but for the fact that the victim is female, the remarks would not have been discriminatorily intimidating, ridiculing or insulting. In the male-female or female-male context, sexual and gender-oriented comments are discriminatory because the offender is expressing by words and acts that the victim is inferior because of her or

his sex. *See* Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII*, 97 Harv.L.Rev. 1449, 1451–55 (1984). In our society, women are subjected to greater instances of violence, objectification and sexual coercion by men which can make "the appearance of sexuality in an unexpected context or a setting of ostensible equality ... an anguishing experience." Abrams, *Gender Discrimination and the Transformation of Workplace Norms*, 42 Vand.L.Rev. 1183, 1205 (1989). Thus, when a male supervisor engages in conduct of a sexual nature, or that is gender-oriented, towards a female employee, he exploits a societal as well as a workplace imbalance in power to disadvantage the female.

■ In a same-gender sexual harassment case, however, conduct of a sexual or gender-oriented nature can not be presumed to be discriminatory. Communications among women do not carry the same societal baggage that creates the inequities Title VII seeks to correct. The sexual or gender-oriented conduct occurs within an environment removed from the concerns about male dominance and sexual violence. The imbalance of power resulting from a dominant gender disadvantaging a subservient gender does not figure into the exchanges between the parties. When the alleged offender and the alleged victim share the same gender, similar sexually suggestive words and acts can take on a whole other meaning.[9] Consequently, while the court acknowledges that there can exist intra-gender power disparities where offensive conduct can be a form of gender discrimination, they cannot be generalized into Title VII or FEHA for they arise in situations that are too varied, individualized and unique for the courts to hold that conduct of a sexual nature or gender-oriented conduct among members of the same gender is presumptively discriminatory.

Returning to the facts of this case, the plaintiffs have not adduced evidence that would demonstrate discrimination based on gender existed in the Glendale office of CROSSLAND. LAMONTE and WASHINGTON treated all the women in the office in the same manner as the plaintiffs. LAMONTE and WASHINGTON treated each other in the same way as well. Indeed, they even treated the men similarly by including them in some the situations the plaintiffs found objectionable, such as WASHINGTON'S birthday party. Discrimination is an act of prejudice that unjustly and unlawfully *excludes* individuals on the basis of some immutable characteristic. LAMONTE'S and WASHINGTON'S actions were not perceived by the plaintiffs to exclude them in any way; those acts were in fact *inclusive*. LAMONTE and WASHINGTON presided over a bawdy sorority in which the plaintiffs were extended and accepted membership. The fact that plaintiffs found this offer distasteful is a positive reflection of their character and professionalism, but unfortunately does not advance a claim of discrimination.[10]

**9.** The court proposes the following mental exercise to make its point. First imagine a man and a woman, who are casual workplace acquaintances, are seated in the lunchroom at the office. As they begin their lunch, the man says, "My penis is too small. Do you think I should get a penile implant to make it bigger?" Imagine the woman listener's reaction and how she feels. Now change the scenario, only this time make it two men. How does the male listener react and feel? Finally, imagine it is now two women, and the one woman says, "My husband's penis is too small. Do you think I should convince him to get a penile implant to make it bigger?" How does the woman listener react and feel this time? Admittedly, the precise answers as to how the listener would respond and feel in each of the scenarios could be as varied as the number of individuals engaged in the mental exercise. However, the fact that virtually every person who participates in this mental exercise would attribute different responses and feelings to the listen-

ers depending on the gender of the speaker and the listener demonstrates that the mere presence of conduct or language in the workplace that is sexual in nature or gender-oriented cannot be presumed to automatically create a discriminatorily hostile environment. The context of the offensive conduct is everything.

**10.** The court is not saying, however, that based on an office environment like that present in Crossland's Glendale office, the plaintiffs could not possibly prevail under workers' compensation law or tort theories of liability. *See e.g., Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal.3d 148, 729 P.2d 743, 233 Cal.Rptr. 308 (1987) (discussing the interaction between the exclusive remedies provisions workers' compensation statute and state tort law). The court merely holds that these facts do not prove up a sexually discriminatorily hostile work environment which is essential if the plaintiffs want to prevail on the Title VII or FEHA causes of action.

To the extent that a reasonable woman would find the female-dominated atmosphere of the Glendale office of CROSSLAND to be hostile or abusive, she could not reasonably conclude that it was so because it discriminated against her as a woman. A woman could find the sexually charged office atmosphere to be oppressive because she, like many other men and women in society, did not feel comfortable with sexuality being openly or vulgarly expressed, especially in the workplace.[11] Being uncomfortable or disturbed with sexual or other offensive conduct does not rise to violation of Title VII.[12]

The Ninth Circuit has warned courts of the dangers of taking a rigid approach to adjudicating sexual harassment claims.

> [N]o set of rules will provide an answer in all circumstances. Five-part, seven-part or even ten-part tests frequently serve only to obfuscate the real inquiry. In truth, there is no substitute for a rigorous examination in each instance of all the relevant facts and circumstances, as well as the application of common sense, sound general principles, and a true understanding of human nature.

*Nichols,* 42 F.3d at 513. As the issue of same-gender sexual harassment is increasingly litigated, common sense and an understanding of human nature are definitely needed to prevent overreaction to these types of claims in either direction. Courts must not lose sight of the plain language and unequivocal purpose of Title VII: to prohibit gender-based discrimination, *inter alia,* in the workplace. Title VII, however, does not create a tort of offense nor will this court construe the statute to allow a cause of action for embarrassment. If there is no discrimination, a Title VII claim is not viable avenue for correction of perceived distaste.

Accordingly, this court grants defendants' motion for summary judgment on the hostile environment sexual harassment claims brought under Title VII and FEHA.

### D. Other State Law Claims

#### 1. Constructive Discharge

 MAARUP and SCOTT bring claims for constructive discharge based on the hostile work environment in CROSSLAND'S Glendale office. To prevail on this claim plaintiffs must prove that "the employer [or its agent] either intentionally created or knowingly permitted working conditions that were so intolerable ... that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." *Turner v. Anheuser–Busch, Inc.,* 7 Cal.4th 1238, 876 P.2d 1022, 1029, 32 Cal.Rptr.2d 223, 230 (1994). None of the facts show that LAMONTE or WASHINGTON intentionally created an atmosphere that would force reasonable people to resign. If anything, the facts show that LAMONTE and WASHINGTON created

---

11. Judge Reed in the U.S. District Court of Nevada faced a case similar to the one before this court. It was a same-gender hostile environment claim brought by male plaintiffs against their male supervisors and co-workers. The plaintiffs alleged that the defendants " 'engaged in sexual harassment of plaintiffs by means of writing, drawing, and explicitly discussing homosexual sex acts, excrement, urine, and other topics in a depraved manner.' " *Fox,* 876 F.Supp. at 1172 (quoting from the complaint). This conduct was engaged in before the "general employee population." *Id.* at 1173. The defendants' 12(b)(6) motion was granted because the "complaint [did] not allege facts from which men, such as the plaintiffs, or women could reasonably conclude they were being intimidated, ridiculed, or insulted because they were men or women." *Id.* at 1175. The court declined to hold that it was reasonable for a person to be uncomfortable with the homosexual nature of some of the conduct, and found the "homosexual aspect of the environment to be irrelevant." *Id.* All that remained was a "sexually charged atmosphere."

*Id.* "[U]naware of any modern case standing for the proposition that sexuality in itself is hurtful to men or women," *id.,* the court held that

> [w]hile reasonable persons might be offended by excessive depiction of sexuality, this type of offence or hostile environment is not hostile on the basis of sex, or gender. It is only hostile to a person's notions of sexuality and its proper role or place.

*Id.* at 1176. I find this reasoning persuasive.

12. Admittedly, it will be hard for plaintiffs to prevail on same-gender hostile environment sexual harassment lawsuits. Thankfully, that is because instances of intra-gender gender discrimination are a much less common occurrence in society. By way of clarification, this court is not saying that a same-gender *quid pro quo* claim should be any more difficult to maintain. As long as an employer conditions the benefits of employment on the employee's acceptance of that employer's sexual advances, the gender of either party is irrelevant to the determination of sexual harassment.

what they considered to be a "fun" place to work for their employees. Moreover, MAARUP and SCOTT never told LA-MONTE or WASHINGTON that the atmosphere that they created was oppressive or abusive or would cause them to quit. Nor did MAARUP and SCOTT contact anyone in the personnel department or the management of CROSSLAND to complain. Accordingly, summary judgment is granted against MAARUP and SCOTT on this claim.

### 2. Assault and Battery

■ SCOTT alleged a tort action for assault and battery based on "unlawful touching." (First Amended Complaint ¶ 54). "Harmful or offensive conduct, intentionally done, is the essence of battery (Rest.2d Torts § 18), while apprehension of such contact is the basis of assault (Rest.2d Torts § 21)" 5 Witkin, *Summary of California Law* § 347 (9th ed. 1988). The only evidence of a possible unlawful touching was when she felt she was pinched on the rear end while walking down a hallway at the office. SCOTT does not know who pinched her. SCOTT had no apprehension that she was about to be pinched. She cannot prevail on her assault or battery charges against LAMONTE or WASHINGTON. Accordingly, summary judgment is granted for the defendants.

### IV. ORDER

Accordingly, the court GRANTS summary judgment in favor of the defendants LAMONTE, WASHINGTON and CROSSLAND as to all claims for relief brought by plaintiffs EASTON, MAARUP and SCOTT. Further, this court DISMISSES all the defendants' counterclaims brought against all plaintiffs.

IT IS SO ORDERED AND ADJUDGED.